No. 2449.

Second Circuit.

———

MOORE v. LOUISIANA & ARKANSAS
RAILWAY COMPANY.

———

(April 10, 1926.    Opinion and Decree.)

———

(*Syllabus by the Court.*)

1. **Louisiana Digest—Appeal—Par. 625, 628.**

A finding of fact by a jury in favor of a railroad company and against a private citizen, approved by the trial judge, who refused a new trial, will not be disturbed by the Court of Appeal unless clearly erroneous.

Jahncke Service, Inc., vs. Hewson, 1 La. App. 22.

Irwin & Co. vs. Warner & Co., 1 La. App. 23.

Elston, Prince and McDade vs. Economy Cash Store, 1 La. App. 36.

Brenard Mfg. Co. vs. Allen, 1 La. App. 44.

Keller vs. Jos. Reid Gas Engine Co., 1 La. App. 67.

Miles vs. Reclamation Oil Producing Assn., 1 La. App. 94.

Snell vs. Kearny & Sons, 1 La. App. 106.

Bourgh vs. Hester, 1 La. App. 152.

Brunswick-Balke-Collender Co. vs. Aitkens, 1 La. App. 217.

Billaudeaux vs. Manuel, et al., 1 La. App. 219.

People's Bank & Trust Co. vs. Racca, 1 La. App. 222.

Boutin vs. Bradley, 1 La. App. 260.

Miller vs. Morgan's La. & T. R. R. and S. S. Co., et al., 1 La. App. 267.

Reliance Homestead Assn. vs. McMahon & Sons Undertaking Co., Inc., 1 La. App. 279.

Bianchi vs. Mussachi, 1 La. App. 291.

Graham Paper Company vs. Lewis, 1 La. App. 317.

2. **Louisiana Digest—Evidence—Par. 54.**

Where one charges another with culpable omission of or breach of duty, he who makes the charge is bound to prove it, even though it involves proving a negative.

Leonce Laborde vs. La. Ry. & Nav. Co., 2 La. App. 331.

State vs. Nicolosi, 128 La. 842, 55 South. 475.

Vinton Oil & Sulphur Co. vs. Gray, 135 La. 1062, 66 South. 357.

Frost-Johnson Lumber Co. vs. Sallings Heirs, 150 La. 763, 91 South. 207.

(Civil Code, Art. 2315. Editor's Note.)

Appeal from the Second Judicial District Court of Louisiana, Parish of Webster, Hon. John S. Richardson, Judge.

Action by W. A. Moore against Louisiana & Arkansas Railway Co., for damages for personal injuries.

Judgment for defendant.

Plaintiff appealed.

Judgment affirmed.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, attorneys for plaintiff, appellant.

White, Holloman and White, of Alexandria, attorneys for defendant, appellee.

STATEMENT OF THE CASE.

REYNOLDS, J.    Plaintiff sued to recover $26,900.00 damages for injuries alleged to have been sustained by him in falling from the steps of defendant's train at Sarepta, Louisiana, on December 22, 1923.

The defendant denied liability.

The case was tried by a jury and there was judgment for the defendant rejecting plaintiff's demand.

A new trial having been applied for and denied, the plaintiff appealed.

### OPINION.

Plaintiff says that he sprained his sacro iliac joint in stepping from defendant's train at Sarepta, Louisiana, on December 22, 1923.

\* \* \* \*

Dr. J. B. Benton testified, pages 90, 93, that such a sprain would necessarily immediately cause excruciating pain.

\* \* \* \*

"Q. Now, doctor, doesn't it require a pretty severe blow to cause a dislocation of the sacro iliac joint or separation there?

"A. It was held up a long while among the profession that you could not have a dislocation of the sacro iliac joint without fracture; it was bound together so tight, it was constructed in such a way, that it was practically impossible to dislocate it without a fracture of the bone."

\* \* \* \*

"Q. I say it would take some sudden tremendous blow or force to cause this separation, would it not?

"A. Strong.

"Q. Yes.

"A. Yes, I am sure it would.

"Q. And just to cause a sprain would take considerable force or strain, would it not?

"A. It would take some force, no doubt.

"Q. Would it not take considerable?

"A. Yes.

"Q. Because otherwise everybody would have them, if just from an ordinary jar they could get one. That is correct, is it not?

"A. Yes, sir.

"Q. Now, when the sprain or separation occurs, is it not always accompanied with violent pain and suffering?

"A. Yes, sir."

At the time plaintiff stepped from defendan't train and is alleged to have suffered a sprain of the sacro iliac joint, there was no outcry by him whereby any of the train crew or passengers on the train or persons about the depot might have learned that he had suffered an injury. In fact, Mr. G. R. Best, the auditor on the train, whose duty it was to assist passengers on and off the train, did not learn of the alleged accident until the filing of this suit, November 19, 1924, nearly a year afterward.

Immediately after plaintiff alighted from the train he was carried in an automobile by Mr. W. W. Dean to his (plaintiff's) father's house, about six miles distant, and during the trip he did not say a word about having received a sprain or other injury while alighting from the train. See evidence of Mr. Dean, pages 229 and 230.

"Q. Were you at Sarepta on the night of December 22, 1923, when Mr. Moore says he got off the train there?

"A. I was.

\* \* \* \*

"Q. Did you hear any complaint or outcries when he got off?

"A. No. sir.

"Q. Who took Mr. Moore home?

"A. I did.

"Q. What did he say during the trip or while you were with him about having been hurt in a railroad accident or having been hurt while getting off the train?

"A. He did not say anything to me about being hurt.

"Q. Did you hear him mention it at all?

"A. No, sir.

"Q. Hear him make any complaint at all?

"A. No, sir.

"Q. Hear him say anything about falling when he got off the train?

"A. No, sir; I didn't hear him say anything about falling. Of course, he was complaining some; he was sick.

"Q. Did you know that he had had an operation recently?

"A. I had heard it, yes, sir.

"Q. Did he say anything about there being no step box there and no one there to help him off the train?

"A. No, sir.

"Q. Did he say anything about having hurt his hip when he got off the train?

"A. No, sir.

"Q. Where did you take Mr. Moore?

"A. To his father's.

"Q. Did you help him get out of the car?

"A.  Yes, sir.

"Q.  Who else, that you remember?

"A.  I helped him out of the car and helped him in the house and put him to bed.

"Q.  During that time did you hear him say anything about having slipped or fallen out of the train as he got off?

"A.  He did not."

Charles T. Deloach testified, page 211, et seq.:

"Q.  Mr. Moore has testified that he slipped or fell when he got off that train. Were you looking at him as he got off?

"A.  Yes, sir.

"Q.  What have you to say as to his falling?

"A.  Well, if he fell I didn't detect it.

"Q.  You did not see it?

"A.  No, sir.

"Q.  How close did he pass to you after he got off the train?

"A.  Six or eight feet.

"Q.  Did he say anything to you?

"A.  No, sir.

"Q.  What complaints, if any, did you hear him make?

"A.  I don't know that Mr. Moore knew that I was out there.

"Q.  What complaints, if any, did you hear him make in regard to having fallen?

"A.  I never heard him make any.

"Q.  What exclamations or outcries did he make when he fell and hurt himself so severely, as he said that he did?

"A.  If he made any, I didn't hear them.

"Q.  How close were you to him?

"A.  From six to eight feet; I don't think he was closer to me than six feet."

We cannot reconcile plaintiff's silence on alighting from the train and afterwards as to having sprained his sacro iliac joint in alighting from the train with his contention here.

It is clear that he had sprained, fractured or displaced his sacro iliac joint at some previous time, for he had had three X-ray pictures made of his lower spine and hip bone and each of these pictures showed a slight widening of the sacro iliac joint. One of these radiographs was made on October 28, 1923—almost two months before the date on which the plaintiff claims his sacro iliac joint was sprained in alighting from the train.

Dr. S. G. Barrow testified, pages 3, 4 and 5:

"Q.  How many X-rays have you made of Mr. Moore?

"A.  We have examined him three times; the date just mentioned, then on January 25, 1924, and again on March 24, 1924.

.     *   *   *   *

"Q.  Of what part of the body?

"A.  That examination was made at the request of Dr. Benton. The examination made at that time was of his pelvis—that is, his lower spine and hip bones and all the bones in that section of the body.

"Q.  Have you that picture?

"A.  I have.

"Q.  Just explain, doctor, what it discloses?

"A.  The examination at that time is registered on plate number 12250 and our report read thus:  Radiograph examination shows slight widening or separation of the sacro iliac line."

We are unable to harmonize the fact of the widening or separation of plaintiff's sacro iliac line on October 28, 1923, with his contention in this suit that he sprained his sacro iliac in stepping or falling from defendant's train on December 22, 1923.

There are three hundred and fifteen pages of testimony in the record, but in our opinion it is not necessary for us to comment on all of it, for plaintiff in his petition alleges three acts of omission on the part of the defendant as the proximate cause of his alleged injuries.

1.  That defendant negligently failed and omitted to have lighted its station and depot grounds at Sarepta, it being night and very dark when the train on which plaintiff was riding as a passenger arrived at said station.

2.  That it negligently failed and omitted to assist plaintiff in alighting from said train, well knowing that he was ill and feeble.

3. That it negligently failed and omitted to provide and furnish a foot-stool or step box for plaintiff to use in alighting from said train.

The first ground of complaint, that defendant failed to have its station and depot grounds lighted, as an independent proposition, is not relevant to a decision of this case for the reason that plaintiff does not claim to have received his injury in the depot or on the depot grounds, but in stepping from the car. Hence the only question to be decided as to the lights is, whether or not defendant provided sufficient light at the step of the car to enable plaintiff to step from the car to the platform in safety.

The jury that tried the case evidently thought that the light that shone through the windows and vestibule of the car from which plaintiff alighted and from the car just in front of it together with the light from the lanterns of the auditor and brakeman was sufficient to enable plaintiff to see how to alight from the car with safety, and the evidence, we think, sustains this conclusion.

The second and third alleged acts of negligence may be considered together.

Besides his own testimony and that of his wife, plaintiff introduced that of Mr. and Mrs. O. S. Downer, Miss Argin Herrick, Jewel Nations and Frank Slack, all of whom testified, in substance, that the auditor, Mr. G. R. Best, was not at the door of the passenger coach as the passengers alighted from defendant's train at Sarepta on the night of December 22, 1923, no step-box for the passengers to step on as they stepped from the coach, and no lighted lanterns to enable passengers to guide their steps in alighting from the coach.

Defendant introduced S. G. Norton, the conductor, G. R. Best, the auditor, Robert Dowdle, brakeman of the train in question, and Clyde Smith and J. L. Smith, all of whom testified directly to the contrary.

We are convinced that the testimony of these five witnesses is true. We are also satisfied that the seven witnesses who testified for plaintiff were honest and believed the facts to be as testified to by them; but in the last analyses the question at issue was one of fact, and the jury who saw and heard the witnesses testify decided the case in favor of the defendant, and the District Judge, in refusing a new trial, approved their verdict.

We have carefully read all the evidence in the case and the able and earnest brief of counsel for plaintiff, and are convinced that the preponderance of the evidence sustains the verdict of the jury and the judgment of the court.

It is therefore ordered, adjudged and decreed that the judgment appealed from be affirmed.